469 So.2d 1087 (1985)
STATE of Louisiana, Appellee,
v.
Doris Ann WILSON, Appellant.
No. 16965-KA.
Court of Appeal of Louisiana, Second Circuit.
May 8, 1985.
Rehearing Denied June 7, 1985.
*1088 Donald R. Minor, Indigent Defender, Shreveport, for appellant.
William J. Guste, Jr. Atty. Gen., Baton Rouge, Paul J. Carmouche, Dist. Atty., Robert Gillespie, Jr. and John Broadwell, Asst. Dist. Attys., Shreveport, for appellee.
Before FRED W. JONES, Jr., NORRIS and LINDSAY, JJ.
NORRIS, Judge.
Defendant, Doris Ann Wilson, age 27, was indicted for the offense of cruelty to a juvenile in violation of La.R.S. 14:93,[1] *1089 found guilty by jury verdict and sentenced to serve eight years imprisonment at hard labor. From her conviction and sentence, defendant appeals, originally assigning 22 errors, seven of which are briefed and urged in this court.[2] For the reasons expressed, we affirm defendant's conviction and sentence.

FACTS
On October 24, 1980, Cedric, defendant's four and one-half year old son, was admitted to the LSU Medical Center emergency room in Shreveport, Louisiana, after being brought there by defendant's live-in boyfriend, James Jamison. Cedric was comatose upon arrival and Dr. John Smith observed that the youngster had not only head injuries but bruises and abrasions over much of his body. Cedric also had several fractured ribs and blood in his abdomen. According to the medical testimony, some of Cedric's wounds had begun to heal and must have been several days old, but many were "very new." By way of history, Jamison informed Dr. Smith that Cedric had fallen out of his chair at suppertime and begun choking, and that Jamison had attempted to perform what he termed a "Heimlich Maneuver" to help Cedric breathe. Jamison denied whipping Cedric that night but admitted punishing the child by frequent whippings and by placing him in the closet. Jamison also told Dr. Smith that Cedric had been admitted to the hospital approximately two weeks earlier after falling out of a tree.
On the night of October 24, 1980, defendant was working at the Congo Room bar when Jamison called and informed her that Cedric had been hospitalized and needed surgery and that she should come immediately to the hospital to consent to the surgery. Defendant rushed to the hospital and was able to see Cedric for a few minutes before emergency surgery. Cedric never recovered; he died October 26, 1980 at 8:18 a.m. from multiple trauma to his head and body.
Following Cedric's death, Dr. Peitsch of the Medical Center contacted the Shreveport Police and informed them he suspected Cedric's death was attributable to child abuse.
On the morning of October 26, 1980, Jamison and defendant returned to their residence. Shortly thereafter, Officers Annie Johnson and Cecil Carter of the Shreveport Police came to the residence and advised both of their rights. Defendant and Jamison voluntarily went to police headquarters at the officers' request and gave recorded statements. Before giving the recorded statement, defendant was again fully advised of her constitutional rights.
Subsequently, on November 3, 1980, Barbara Harris and Martha Rutledge, case workers with the Louisiana Child Protection Center, were contacted by Shreveport Police concerning the incident involving Cedric Wilson. Harris and Rutledge were informed that an investigation of the matter was in progress and that Jamison had been arrested for Cedric's death. Harris and Rutledge went to defendant's home and interviewed her. Defendant was not under arrest at the time and the workers had no power to arrest her. Defendant told Harris and Rutledge upon their arrival that they could come in and talk but that she was waiting on someone to take her to the police station for another statement. During the interview, defendant told the *1090 case workers that Jamison was good to Cedric and that she, too, had to discipline Cedric. Defendant related an incident that had occurred several days before Cedric was taken to the Medical Center when he kept getting close to her and she sat on him until he began to sweat. Defendant also related to Harris and Rutledge that she disciplined Cedric with an extension cord on occasion.
After the short interview with Harris and Rutledge, defendant again went to the police station where, as a suspect in an investigation, she again received her Miranda rights, and gave another recorded statement. After giving this statement, defendant was placed under arrest. In the recorded statement defendant admitted she had whipped Cedric with an "extension cord" on Tuesday or Wednesday before his death. During the recorded interview, defendant was shown pictures of Cedric's body, taken after his death, and she pointed out certain bruises, abrasions and wounds that she had inflicted on her child prior to October 24, 1980.
At trial, the state presented the testimony of Dr. Smith, Dr. Robert Braswell, the coroner, Rutledge, Harris, Officer Johnson, and Detectives Bennett and Carter. The state also introduced the recorded statements, the substance of the interview with Harris and Rutledge and the pictures used in the November 3, 1980, recorded statement.
Drs. Smith and Braswell testified that many of the injuries on Cedric's body had been, in their opinion, inflicted earlier than October 24, 1980. Referring to the photographs, Braswell testified that some of the wounds present on Cedric's body were several weeks old but that the majority of the wounds had occurred within a week or ten days before admission to the Medical Center. Braswell also testified that some of the wounds probably occurred on the very day of his admission. Braswell's testimony was that all the wounds would cause pain and suffering and that the cause of Cedric's death was multiple trauma to his head and body.
The defense presented witnesses, mostly family of the defendant, who testified they had never known defendant to mistreat her child. With the exception of defendant, her daughter and brother, however, none of these witnesses had seen Cedric for weeks or months before October 24, 1980. Defendant's brother, Donald Ray Wilson, testified he was concerned with the type of discipline Jamison administered to Cedric but had said little about the subject because he was afraid it would cause a fight with Jamison. Donald Wilson also testified that defendant was aware of Jamison whipping Cedric. Defendant's daughter, Angela, who was six years old in October of 1980, testified Jamison severely beat Cedric on October 24, 1980, but that she had never seen her mother whip Cedric and had never noticed any of the injuries depicted on the pictures prior to October 24, 1980. Angela's testimony that Cedric had no injuries prior to October 24, 1980, was disputed by defendant's own testimony. Defendant testified on her own behalf and admitted giving the statements referred to above freely and voluntarily. However, she denied telling Harris and Rutledge she sat on Cedric until he began to sweat. She contended that by some means the police had altered the tapes to say things she never intended to say.
The six member jury returned a unanimous verdict of guilty as charged. Defendant appeals her conviction relying on seven of her original assignments of error. The assignments briefed and argued on appeal are:
(1) The trial court erred in denying defendant's motion to suppress statements;
(3) The trial court erred in denying defendant's challenge for cause of prospective juror Marjery C. Whitten;
(4) The trial court erred in denying defendant's challenge for cause of prospective juror Alvin R. Adams;
(5) The trial court erred in admitting into evidence over defense objections state exhibits S 1-18, as well as enlargements of those photographic exhibits;

*1091 (8) The trial court erred in denying defendant's motion for mistrial which was made when the prosecutor solicited testimony that defendant's other child (Angela) had been taken into custody by the Child Protection Agency upon her arrest for the instant offense;
(11) The trial court erred in allowing the jury to view state photographic exhibits 1-11 and 16 over defendant's objection to their relevancy and prejudicial effect; and
(19) The trial court erred in refusing to charge the jury with defendant's special requested instructions numbered 2 and 5.

ASSIGNMENT OF ERROR NO. 1
Here, appellant contends the trial court erred in refusing to suppress two recorded statements taken by Shreveport Police on October 26, 1980 and on November 3, 1980. Appellant does not contest the oral statement she made to Louisiana Child Protection Agency workers, Margaret Rutledge and Barbara Harris, on November 3, 1980, prior to the recorded statement. The thrust of defendant's attack on the contested statements is that at the time she made them she was under emotional distress and did not make a knowing and intelligent waiver of her rights.

(a) OCTOBER 26, 1980 STATEMENT
Cedric died at 8:18 a.m. on October 26, 1980. Officer Annie Johnson, Agent Leonard Bonnette and Officer Dorothy Land, all of the Shreveport Police Department, went to defendant's residence around 10:00 a.m. on that date and observed defendant and a black male standing in the yard. Johnson stated she identified herself and the other officers, told defendant they needed to talk to her about her son's death, advised defendant of her Miranda rights, and asked if defendant and Jamison would voluntarily come to the police station for questioning. Defendant and Jamison both consented and voluntarily went to the station in their own vehicle.
After defendant arrived at the police station, she was again fully advised of her Miranda rights. She signed the rights form acknowledging this fact and also signed a waiver form which stated in essence that she had read her rights, understood them, was willing to make a statement, did not want a lawyer, and that no promises or threats had been made to her and no pressure or coercion of any kind had been used against her. The rights form further contains a certificate signed by Johnson, Bonnette and defendant acknowledging that the procedure referred to above had been complied with. Officer Johnson testified defendant appeared to have been crying when they first arrived at her residence; that defendant did not appear intoxicated or under the influence of drugs; that defendant was rather slow in responding; and that defendant did cry at some point during the recorded interview. Johnson further testified, however, that defendant appeared to fully understand and waive her rights, that no promises or threats were made to defendant, that no pressure or coercion was used, and that defendant's statement was indeed free and voluntary. After giving this recorded statement, defendant was not arrested but allowed to return home.

(b) NOVEMBER 3, 1980 STATEMENT
On November 3, 1980, the day following Cedric's funeral, case workers Harris and Rutledge arrived at defendant's residence shortly before 11:30 a.m. to interview defendant. They did not come to arrest defendant but only to conduct a Protective Services Investigation for the state of Louisiana. When they arrived, the case workers did not realize defendant was subject to being charged for any crime. Defendant told them she was waiting to go to the police station and therefore the interview was short. During the interview, defendant stated that several days prior to Cedric's death she had sat on him until he began to sweat, and that she used an extension cord to discipline both Cedric and Angela. The case workers testified they did not promise defendant anything, nor did they threaten or coerce her in any manner. Because defendant appeared unconcerned and nonchalant about Cedric's *1092 death, Harris noted on her report that defendant appeared to be either intoxicated or on drugs. However, Harris admitted that this notation was merely a conclusion based on defendant's apparent unconcern and nonchalance; neither Harris nor Rutledge smelled any alcohol on defendant's breath or saw evidence of any drugs.
After the interview with Harris and Rutledge, defendant again went to the police station, where she gave another recorded statement to Detective Cecil Carter and Officer Johnson at approximately 11:30 a.m. Prior to making this statement, defendant was again advised of her Miranda rights from a standard warning card. Defendant was informed she was not under arrest but was a suspect. Defendant, according to Johnson and Carter, stated she understood her rights, and then signed the card and dated it. The officers testified the defendant's physical appearance was normal, she did not appear to be intoxicated or under the influence of drugs, did not ask for an attorney and responded to their questions. The officers testified no promises were made to defendant, and no threats, coercion, or inducements were used against her. They were of the opinion she understood her rights and made an intelligent and voluntary waiver of those rights before giving the recorded statement. The officers did state that defendant was calm and they expressed surprise that defendant did not get upset when she was shown and referred to the pictures of her child's dead body.

(c) APPLICABLE LAW
Before the state may introduce a confession into evidence, it must affirmatively show that the statement was freely and voluntarily given. La.R.S. 15:451. Whether such a showing has been made is analyzed on a case by case basis with regard to the facts and circumstances of each case. State v. Benoit, 440 So.2d 129 (La. 1983).
The admissibility of a confession is in the first instance a question for the trial judge. His conclusions on the credibility and weight of the testimony will not be overturned on appeal unless they are not supported by the evidence. State v. Lindsey, 404 So.2d 466 (La.1981); State v. Broadway, 440 So.2d 828 (La.App. 2d Cir. 1983).
Emotional distress is not grounds for rendering a confession inadmissible unless it is so severe that the party confessing is unable to do so voluntarily. State v. Williams, 383 So.2d 369 (La.1980); State v. Beck, 445 So.2d 470 (La.App. 2d Cir.1984) writ denied, 446 So.2d 315 (La.1984). Similarly, intoxication will render an inculpatory statement or confession inadmissible only where the intoxication is of such a degree that the defendant's ability to comprehend the consequences of her statement has been negated. State v. Mitchell, 437 So.2d 264 (La.1983).
Applying this law to the facts in the record, we certainly cannot say the trial court's conclusion that the contested statements were freely and voluntarily given, are unsupported by this record. Every witness emphasized defendant's apparent comprehension and cooperation. In our view, the trial judge properly analyzed the totality of the circumstances in this case and correctly determiend that defendant's statements were given freely and voluntarily in spite of their closeness in time to Cedric's death and funeral.
This assignment of error is without merit.

ASSIGNMENTS OF ERROR NOS. 3 & 4
In these assignments, defendant contends the trial court erred in denying her challenges for cause directed at prospective jurors Marjery Whitten and Alvin R. Adams. Defendant attempted to challenge prospective juror Whitten for cause on the ground that she could not be impartial if she observed graphic pictures of the abuse perpetrated upon the victim. Defendant attempted to challenge prospective juror Adams on the ground that he could not be fair and impartial because of the sensitive nature of the charge against defendant.
*1093 We note this case was tried July 23, 1984 through July 27, 1984. In 1983 the Legislature amended Article 800 of the Code of Criminal Procedure to read as follows:
Art. 800. OBJECTION TO RULING ON CHALLENGE FOR CAUSE.
A. A defendant may not assign as error a ruling refusing to sustain a challenge for cause made by him, unless an objection thereto is made at the time of the ruling. The nature of the objection and grounds therefor shall be stated at the time of objection.
B. The erroneous allowance to the State of a challenge for cause does afford a defendant a ground for complaint, unless the effect of such ruling is the exercise by the State of more peremptory challenges than it is entitled to by law.
The effective date of the amendment was August 30, 1983. This amended version of Article 800 applies to the trial of the instant matter. Compare, State v. Edwards, 459 So.2d 1291 (La.App. 1 Cir.1984).
Prior to the amendment to Article 800, all the defendant needed to do to preserve his complaint against the trial court's ruling denying a challenge for cause was to exhaust his peremptory challenges before completion of the jury panel. Now, under the clear terms of Article 800, as amended, a "defendant may not assign as error a ruling refusing to sustain a challenge for cause made by him unless an objection thereto is made at the time of the ruling."
The record reflects that defense counsel challenged each juror complained of for cause, the challenges were denied by the court, and defense counsel made no objection to the rulings denying the challenge for cause but simply exercised a peremptory challenge. Thus, these two assignments of error have not been properly preserved for appellate review.
However, because defendant did exhaust her peremptory challenges prior to completion of the jury panel and because of the closeness in time between the amendment changing the law and this trial, we will, out of an abundance of precaution, consider whether the trial judge erred in denying the challenges for cause complained of.
Prospective juror Whitten testified she was close to children, kept her grandchildren and tended to overreact when it came to children. She stated she had a tendency to believe she would be prejudiced by looking at a picture of child abuse. However, on further questioning, she stated she would try her best to put personal feelings aside and to reach a decision based solely on the law and evidence. She further answered that she could look at photographs and then reach a fair verdict based on the evidence as to whether the person on trial actually committed the abuse that might be depicted in the pictures. She finally stated she could be fair and impartial regardless of what the pictures showed.
Prospective juror Adams admitted during voir dire that child abuse was a sensitive topic that stirred very tender feelings within him. Adams did, however, say he understood the state's burden of proof beyond a reasonable doubt and that he would require such proof. He also answered that he could understand and apply the law. Adams never stated that he could not be a fair and impartial juror.
The trial judge is vested with broad discretion in ruling on a challenge for cause and his ruling will not be disturbed on appeal absent a showing of abuse. State v. Monroe, 366 So.2d 1345 (La.1978). Only where it appears upon review of the voir dire examination as a whole, that the judge's exercise of that discretion has been arbitrary or unreasonable, and results in prejudice to the accused, will an appellate court reverse the ruling of the trial judge. State v. Passman, 345 So.2d 874 (La.1977); State v. Pettaway, 450 So.2d 1345 (La.App.2d Cir. 1984). A trial judge's refusal to excuse a prospective juror for cause is not an abuse of his discretion, notwithstanding that the juror has voiced an opinion seemingly prejudicial to the defense, where on further inquiry or instruction, he has demonstrated a willingness and ability to decide the case impartially according to the law and the *1094 evidence. State v. Nix, 327 So.2d 301 (La. 1976); State v. Pettaway, supra.
In the instant case, the prospective jurors complained of certainly expressed concern over the sensitive nature of child abuse cases because of their feelings for children. However, viewing the voir dire examination of each of these two prospective jurors as a whole and applying the basic principles of law set forth above, we conclude that the trial judge did not abuse his discretion in denying both challenges for cause.
These assignments of error are without merit.

ASSIGNMENTS OF ERROR NOS. 5 & 11
In these assignments, defendant argues the trial court erred in admitting into evidence pictures which showed the victim of the crime after he had expired. Defendant argues that because the pictures depicted the dead victim covered with surgical scars, and because some were taken after the autopsy had been performed, their prejudicial effect outweighed any probative value they might have had.
The state contends that the pictures were necessary to prove its case, highly probative, and that the prosecutor and the court made every effort to minimize any prejudicial effect.
The record reveals the pictures of the dead child did show surgical scars in addition to numerous other wounds, abrasions and injuries. Dr. Braswell, the coroner, referred to the pictures during his testimony to point out certain injuries which he attributed to beatings and whippings as well as to certain injuries that were attributable to medical rescue efforts. During defendant's statement of November 3, 1980, the pictures were referred to extensively by both Detective Carter and defendant to clarify which injuries Cedric had prior to October 24, 1980, and which injuries occurred on October 24, 1980, and how these injuries came about. Defendant also used and referred to the pictures in her testimony before the jury.
We also note that the lower court ruled that exhibits 12-15, 17 and 18, photographs which were taken after the autopsy was begun, could not be shown to the jury although they were admitted into evidence. State exhibit 5 was ordered masked by the court to cover the victim's face. The record also reflects that the jury was shown only the 3 X 5 pictures by the state rather than the enlargements. Finally, the court, prior to allowing the jury to view the photographs, admonished the jurors that the "defendant is not charged with the death of Cedric Wilson and you should bear that in mind when you look at the photographs."
The ruling of a trial court with respect to the admissibility of allegedly gruesome photographs will be disturbed only if the prejudicial effect of the photographs clearly outweighs their probative value. State v. Tonubbee, 420 So.2d 126 (La.1982). The photographs here were allowed into evidence, over defense counsel's objection, to corroborate the medical and lay testimony as to the condition of the victim prior to October 24, 1980, and his condition at the time he was brought to the emergency room. The photographs were indeed probative and necessary to the state's case.
Although the photographs at issue are unpleasant, it cannot be said that they are so gruesome as to overwhelm the reason of jurors, and to cause a jury to lose sight of the need for the state to establish with independent evidence the guilt of the accused. State v. Germain, 433 So.2d 110 (La.1983). This is especially true in light of the limitations imposed and admonition given by the trial court in connection with their admission.
This assignment of error lacks merit.

ASSIGNMENT OF ERROR NO. 8
In this assignment, defendant complains that the trial court erred in denying her motion for a mistrial made when the prosecutor allegedly referred to another crime. The prosecutor asked Margaret Rutledge if she took defendant's daughter, Angela, *1095 into custody when Rutledge arrived at the police station where defendant had gone to give a recorded statement on November 3, 1980. The pertinent questions and answers are as follows:
Q. After she told you this, what happened? Did you leave the house?
A. Yes, sir. Not that second, you know, but after we concluded talking. Like I said, she was on her way down to the police station. So she had talked with us a little bit and she had left and gone down to the police station.
* * * * * *
Q. Now, did you later go to the police station yourself?
A. Yes.
Q. Did you take into custody Angela?
MR. MINOR: I would object to that and ask the jury be removed.
Defense counsel went on to explain that his objection was based on relevancy and the prejudicial nature of the question, stating that, "it's prejudicial to bring out that whether justified or not there was any action on the part of the state to take Mrs. Wilson's other child, Angela Wilson, into its custody."
The court sustained the objection and when the jury returned admonished the jurors to disregard the question.
La.C.Cr.P. art. 770 provides in pertinent part:
Upon motion of a defendant, a mistrial shall be ordered when a remark or comment, made within the hearing of the jury by the judge, district attorney, or a court official, during the trial or in argument, refers directly or indirectly to:
* * * * * *
(2) Any crime committed or alleged to have been committed by the defendant as to which evidence is not admissible;
* * * * * *
An admonition to the jury to disregard the remark or comment shall not be sufficient to prevent a mistrial. If the defendant, however, requests that only an admonition be given, the court will admonish the jury to disregard the remark or comment but shall not declare a mistrial.
La.C.Cr.P. art. 771 provides in pertinent part:
In the following cases, upon the request of the defendant or the state, the court shall promptly admonish the jury to disregard a remark or comment made during the trial, or in argument within the hearing of the jury, when the remark is irrelevant or immaterial and of such a nature that it might create prejudice against the defendant, or the state, in the mind of the jury:
(1) When the remark or comment is made by the judge, the district attorney, or a court official, and the remark is not within the scope of Article 770; or
(2) When the remark or comment is made by a witness or person other than the judge, district attorney, or a court official, regardless of whether the remark or comment is within the scope of Article 770.
In such cases, on motion of the defendant, the court may grant a mistrial if it is satisfied that an admonition is not sufficient to assure the defendant of a fair trial.
Here, the attempted line of questioning on the part of the prosecutor was not a direct or indirect reference to other crimes evidence. The fact the state might have taken Angela into custody after defendant was arrested does not necessarily imply that defendant abused Angela. The jury knew that Jamison and defendant had been arrested and that Angela had, prior to their arrest, lived with them. The question may well have been irrelevant but was not a direct or indirect reference to other crimes evidence.
In State v. Smith, 327 So.2d 355 (La. 1976), the Louisiana Supreme Court discussed the requisites necessary to mandate a mistrial when an indirect response is made to one of the prohibited subjects enumerated in Article 770. The court stated:

*1096 In order to mandate a mistrial ... the inference must be plain that the remark was intended to bring the jury's attention to the failure of the defendant to testify.
[Citations omitted.] 327 So.2d at 362.
See also, State v. Burkhalter, 428 So.2d 449 (La.1983); State v. Jackson, 454 So.2d 116 (La.1984).
Assuming, but not holding, that the question posed by the prosecutor in the instant case could be considered a remote or indirect reference to another crime, it is evident, in the context of the entire questioning of witness Rutledge, that the question was not intended to call the jury's attention to other crimes evidence. Under the circumstances present, the defendant was not denied a fair trial by the prosecutor's question, and the trial judge did not abuse his discretion in refusing to grant a mistrial. The admonition was sufficient to cure any possible prejudice.
This assignment of error lacks merit.

ASSIGNMENT OF ERROR NO. 19
Defendant argues here that the trial court erred in refusing to charge the jury with her requested special instructions numbers 2 and 5 which were as follows:
2.
The term criminal negligence is similar to the terms gross negligence or recklessness. The ordinary negligence sufficient to support a civil action is not enough. Gross negligence and recklessness should be interpreted to mean something more or a greater degree of negligence and recklessness than a mere omission of duty.
5.
You need not be convinced of the defendant's innocence beyond a reasonable doubt in order to return a verdict of not guilty. The law requires you to return a verdict of not guilty even though you have doubts as to defendant's innocence, as long as you have a reasonable doubt as to the defendant's guilt.
A requested special charge shall be given by the court if it does not require qualification, limitation or explanation, and if it is wholly correct and pertinent. It need not be given if it is included in the general charge or in another special charge to be given. La.C.Cr.P. art. 807.
Defendant's special requested charge number 5 was completely included within the court's instruction outlining the state's burden of proof beyond a reasonable doubt. Thus, the trial judge did not err in refusing to give special requested charge number 5. See State v. Square, 433 So.2d 104 (La. 1983).
Similarly, the substance of requested special charge number 2 was included within the trial judge's instructions to the jury. The definition of criminal negligence in the court's charge was taken from La.R.S. 14:14 and correctly instructed the jury as to what constituted criminal negligence. Furthermore, it would have been necessary for the trial judge to explain the terms "civil action" and "recklessness" had it given special requested charge number 2.
Finally, the refusal to give a special requested charge does not warrant reversal of a defendant's conviction unless it prejudices substantial rights of the accused. La.C.Cr.P. art. 921; State v. Marse, 365 So.2d 1319 (La.1978).
The court's charge to the jury in the instant case correctly instructed the jury on the state's burden to prove guilt beyond a reasonable doubt and what constitutes criminal negligence. The refusal to give the special requested charges did not prejudice defendant's rights.
This assignment of error lacks merit.

PATENT ERROR
We have also reviewed the record for patent error. La.C.Cr.P. art. 920. On the date set for sentencing, defendant filed a motion for a new trial and a motion for post verdict judgment of acquittal. Both were denied on that date by the trial judge. We see no evidence in the record that the *1097 trial court waited the required 24 hours after denying defendant's motions before imposing sentence (La.C.Cr.P. art. 873); nor does the record indicate that defendant waived that waiting period. However, defendant does not argue or in any way urge that she was actually prejudiced by the trial judge's failure to observe the waiting period. In State v. Brogdon, 426 So.2d 158 (La.1983), Louisiana Supreme Court held that such failure on the part of the trial court is harmless error where the defendant does not show actual prejudice. See also, State v. Mason, 447 So.2d 1134 (La. App. 1st Cir.1984). In the instant case failure to observe the 873 delay was harmless error.
We have also considered whether the evidence, viewed as a whole and in a light most favorable to the prosecution, was sufficient for any rational juror to conclude that the essential elements of the crime were proved beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). It is clear that the evidence in this case is sufficient to dispel every reasonable doubt. There is no error in this regard.

CONCLUSION
For the foregoing reasons, defendant's conviction and sentence are affirmed.
CONVICTION AND SENTENCE AFFIRMED.
NOTES
[1] La.R.S. 14:93 provides in part:

A. Cruelty to juveniles is the intentional or criminally negligent mistreatment or neglect, by anyone over the age of seventeen, of any child under the age of seventeen whereby unjustifiable pain or suffering is caused to said child. Lack of knowledge of the child's age shall not be a defense.
* * * * * *
D. Whoever commits the crime of cruelty to juveniles shall be fined not more than $1000, or imprisoned with or without hard labor for not more than ten years, or both.
This section was amended in 1984 by Act No. 621, § 1 which designated subsections A to D; and in inserted subsections B and C. The 1984 amendment is not applicable to the instant case.
[2] The remaining assignments of error were not briefed and therefore are considered abandoned. Uniform Rules of the Courts of Appeal, Rule 2-12.4; State v. Trevathan, 432 So.2d 355 (La.App. 1st Cir.1983), writ denied, 437 So.2d 1141 (La.1983).